UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FOSS MARITIME CO.** | **CIVIL ACTION** |
| **VERSUS** | **No. 07-6824** |
| **CASHMAN EQUIPMENT CORP.** | **SECTION I/3** |

### ORDER AND REASONS

Before the Court is a motion for partial summary judgment, filed on behalf of plaintiff, Foss Maritime Co. ("Foss").[1] Defendant, Cashman Equipment Corp. ("Cashman"), has opposed Foss's motion.[2] For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### *BACKGROUND*

In late August 2006, Foss and Cashman executed a lump sum towage contract under which Foss agreed to provide towing services from Shanghai, China to a then undetermined destination in the Gulf of Mexico.[3] Foss's tug, the CORBIN FOSS, was to be used for the job. The tow consisted of two 300-foot barges, the JMC 3003 and JMC 3004. Each of these 300-foot barges was to carry a 250-foot barge on its deck.

---

[1] R. Doc. No. 35, mot. summ. j.

[2] R. Doc. No. 41.

[3] R. Doc. No. 35-3, Paul Gallagher decl. ¶ 3.5. At the time the contract was negotiated, the CORBIN FOSS was en route from Singapore to Seattle, Washington.

1

The CORBIN FOSS arrived in Shanghai on September 3, 2006, and Foss tendered a notice of readiness to Cashman.[4] Cashman's barges were delivered to the CORBIN FOSS on September 19.[5] During the sixteen days it waited for delivery of the barges, Foss alleges that it incurred extra vessel expenses, totaling $199,125.[6] This amount was based upon a total demurrage of 368.75 hours, billed at the contractual rate of $540 per hour.[7] Foss submitted an invoice for the Shanghai demurrage, dated October 26, 2006, to Cashman.[8] Cashman has not paid this invoice.

On October 25, the tow arrived on the west coast of the United States. Foss substituted the LAUREN FOSS, a tug with allegedly similar capabilities, for the CORBIN FOSS.[9] The tow next arrived at Balboa, on the Pacific Ocean side of the Panama Canal Zone ("PCZ"), on November 18 at 0745 local time. It departed Cristobal, on the Atlantic Ocean side of the PCZ, at 1724 local time on November 24.[10] Foss alleges that the actual transit time of the PCZ was approximately 34 hours longer than permitted by the agreement. As a result, Foss submitted an invoice, dated December 13, 2006, to Cashman for demurrage totaling $18,585.[11] Cashman has not paid this invoice.

---

[4] Gallagher decl. ¶¶ 6, 7; R. Doc. No. 35-6, ex. 4; R. Doc. No. 35-6, ex. 5, notice of readiness.

[5] Gallagher decl. ¶ 9.

[6] Id. ¶ 9; R. Doc. No. 35-7, ex. 6.

[7] R. Doc. No. 35-8, ex. 7.

[8] Gallagher decl. ¶ 10.

[9] Id. ¶ 12.

[10] Id. ¶¶ 13, 14; R. Doc. Nos. 35-8, 35-9, exs. 8, 9.

[11] R. Doc. No. 35-10, ex. 1.

Shortly after departing Cristobal, the tow wire of the lead barge was snagged on a submerged obstruction.[12]  While the wire was caught, the two barges collided, suffering damage. Assistance vessels arrived from Cristobal to free the tow wire and barges, and to enable the tow's return to Cristobal.[13]  The LAUREN FOSS, undamaged by these events, and the barges were both back at Cristobal at 1820 hours on November 26.[14]  Repair of the barges was undertaken and completed before the tow departed Cristobal on December 4.  The tow arrived at its destination in the Gulf of Mexico on December 12, 2006.[15]

Foss filed its verified complaint for breach of contract in this Court on October 12, 2007.[16]  Foss sought $343,710 damages plus interest.  Its alleged damages consisted of the Shanghai demurrage, the PCZ demurrage, and the demurrage resulting from the repair period at Cristobal.[17]  Cashman filed its answer, in which it asserted various defenses, on December 4, 2007.[18]

On March 19, 2008, Cashman filed a counterclaim against Foss.[19]  Cashman alleged that the CORBIN FOSS performed poorly during the tow from Shanghai to the west coast of the

---

[12] R. Doc. No. 35-9, ex. 9.

[13] R. Doc. No. 35-10, ex. 11.

[14] Id.

[15] R. Doc. No. 35-12, ex. 13.

[16] R. Doc. No. 1, compl.  In its complaint, Foss also alleged maritime liens in rem against Cashman's barges.  Id. ¶ 17(B).  Those claims were dismissed, without opposition, for lack of prosecution on August 28, 2008.  See R. Doc. No. 59, order.

[17] Compl. ¶¶ 13-15.

[18] R. Doc. No. 5, answer.

[19] R. Doc. No. 24, countercl.

United States.[20]  As a result, Cashman allegedly lost five to six days of chartering fees it could have earned from the barges.  Further, Cashman alleged that the incident at Cristobal was solely the fault of Foss.[21]  Cashman claims that, as a result of the incident, it incurred expenses for the repair of the LAUREN FOSS as well as lost revenue it could have earned from the barges.[22]  Foss filed an answer on August 4, 2008, asserting various defenses.

*LAW AND ANALYSIS*

**I.      Summary Judgment Standard**

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  Celotex, 477 U.S. at 323; Fontenot v. Upjohn Co., 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of

---

[20] Id. ¶ 10.

[21] Id. ¶ 16.

[22] Id. ¶ 13-15.

material fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. Id. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." Id. at 255; see Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

The agreement contains a choice-of-law provision. Section 17 of the agreement states that the agreement "shall be governed by the general maritime law of the United States, insofar as applicable, otherwise by the laws of the state of Louisiana."[23] The Court accordingly applies federal maritime law to the issues contested by the parties.

## II. Shanghai Demurrage

Foss submits that it is owed demurrage for 368.75 hours, which encompasses the time period beginning twelve hours after it tendered a "notice of readiness"[24] to Cashman (September

---

[23] With one exception, the parties cite exclusively federal maritime cases in their memoranda. Foss, discussing the interpretation of the limitation provision, cites several Louisiana cases. See mem. supp. 14. The reason for this non sequitur invocation of state law is not explained by Foss.

[24] R. Doc. No. 35-6, ex. 5, notice of readiness.

3 at 1800 hours) until September 19, 2006, when Cashman's barges were ready to be towed.[25] Cashman does not dispute that its barges were not ready to be towed until September 19, 2006.[26] Instead, Cashman argues that genuine issues of fact and law preclude this Court from determining when the CORBIN FOSS could be deemed ready to commence the tow. As a result, it disputes Foss's characterization of when any demurrage charges began to accrue against Cashman.

Specifically, Cashman first alleges that the notice of readiness tendered on September 3 was premature because the CORBIN FOSS did not arrive at the tow hookup location until September 4. Second, Cashman claims that the necessary fuel for the voyage was not delivered until September 8. Third, Cashman claims that the necessary water for the voyage was not delivered until September 12. Fourth and finally, Cashman alleges that, as late as September 17, the CORBIN FOSS was still making preparatory arrangements for the arrival of the barges.[27] Foss replies that the question of when demurrage commences is determined not by when the tug is ready to depart, but when it is ready to take on the tow.[28]

The parties' agreement states that Cashman "shall be charged the demurrage rate identified on the face hereof in the event the Tow is not ready at the starting port/place on the

---

[25] Pursuant to the agreement, Cashman was allotted twelve hours of "free time" in which to complete the hookup of the barges to the tug. After the free time expired, demurrage would commence.

[26] Mem. opp'n 4.

[27] Id. at 5.

[28] Id. at 11.

6

date and at the time identified."[29]  A separate provision states that Foss "shall use due diligence to tender the Tug at the starting port/place in a seaworthy condition, properly equipped, documented and with all licenses and permits routinely required for the anticipated voyage; the Tug shall be at the starting port/place on the starting date/time indicated on the face hereof."[30]  Cashman concedes that the tow was not ready until September 19, disputing only when demurrage commenced accruing against it.

"In order that laytime may commence, the vessel must be an 'arrived ship,' as defined in the charter party."  2 Thomas J. Schoenbaum & Jessica L. McClellan, Admiralty & Mar. Law § 11-15 (4th ed. 2008).  An arrived ship "can mean that the vessel has reached either a port, a dock, or a berth, depending on the terms of the charter.  The vessel must also be clean and ready to receive cargo, and a notice of her readiness to load must be communicated to the charterer."  Id. (footnotes omitted).  Here, the agreement does not define what constitutes an "arrived ship."  Foss cites persuasive authority that, under the general maritime law, readiness is understood as readiness to receive cargo or towage rather than readiness to sail.[31]

Cashman, on the other hand, argues that a readiness to tow standard is implied by the terms of the contract.  It cites § 4(A), which states that "the Tug shall be at the starting port/place on the starting date/time indicated on the face hereof" and that Foss "shall use due diligence to tender the Tug at the starting port/place in a seaworthy condition, properly equipped . . . for the

---

[29] R. Doc. No. 35-5, ex. 3, standard lump sum towage agreement ("Agreement") § 2(C).  The "starting port/place" is identified as "Outer Harbor, Shanghai PRC" and the "estimated starting date/time" is identified as "1200 September 1st, 2006 LT."  In its memorandum, Foss does not argue that demurrage began to accrue based on the September 1 date, but on the September 3 date when it tendered its notice of readiness.  See R. Doc. No. 35-2, mem. supp. 9.

[30] Id. § 4(A).

[31] Mem. supp. 11.

7

anticipated voyage."[32]

Foss has the better of the argument. First, it has correctly stated the general rule that readiness to receive, not readiness to tow, determines when a vessel is an "arrived ship" for demurrage purposes. Second, and contrary to Cashman's contention, the contract does not impliedly adopt a different rule which provides a readiness to tow standard. Section 4(A) merely demands that reasonable efforts be made for the Tug to be properly equipped and in seaworthy condition for the <u>anticipated</u> voyage. The use of the word "anticipated" is not accidental, particularly when contrasted with the warranties undertaken by Cashman. Section 4(B) provides that "the Tow shall be <u>ready to sail</u> on the starting date/time."[33] The omission of the "ready to sail" language from Foss's warranties implies the adoption of the readiness to receive standard with respect to the tug. The Court concludes that demurrage commenced when the tug was ready to receive the barges.[34]

The next question, of course, is when the tug was ready to receive Cashman's barges. Initially, Foss bears the burden of showing actual readiness, and cannot rely solely on a reporting of readiness. See <u>F.S. Royster Guano Co. v. United States</u>, 18 F.2d 469, 470 (4th Cir. 1927) ("The appellant urges upon us, what is unquestionably true, that, no matter when the ship reported herself ready, lay days could not begin to run until she was so in fact, and that the burden of establishing the fact of readiness is upon her.").

To establish readiness on September 3 at 1800 local time, Foss submits a "Notice of

---

[32] Agreement § 4(A).

[33] Id. § 4(B).

[34] Because the Court concludes that the Tug's readiness to receive is determinative, Cashman's arguments concerning delivery of fuel, delievery of water, and preparation of the deck are unavailing. See mem. opp'n 5.

8

Readiness"[35] that it sent to Cashman on September 3, as well as the daily logs of the CORBIN FOSS for September 3. Citing the same logs, Cashman responds that the tug had merely reached the Mancao Buoy by 1800 local time on September 3, and it was not in position to receive Cashman's barges until 1216 local time on September 4, when the tug reached the Yuanyansha Buoy.[36] The significance of the difference between the Mancao Buoy and Yuanyansha Buoy is not clear from the record presently before the Court. Whether Foss was in position to receive the barges at the Mancao Buoy, as it contends, or only when it reached the Yuanyansha Buoy, as Cashman contends, is a genuine issue of material fact precluding summary judgment for Foss on this claim.[37]

### III.     Foss's PCZ Demurrage Claim

Foss contends that it is owed demurrage for 34.50 hours of delay in excess of the five days allowed for transit of the Panama Canal Zone.[38] Section 2(C) of the agreement provides that Cashman "shall . . . be charged the demurrage rate for any interruption or delay in services caused solely by [Cashman] and/or the Tow and/or its cargoes." Cashman first responds that, contrary to Foss's assertion, transit of the Panama Canal took less than one day. In the

---

[35] In the notice of readiness itself, Paul Gallagher writes that he is sending the notice "[a]s per the Towage Agreement." R. Doc. No. 35-6, ex. 5, notice of readiness. However, no provision of the agreement requires issuance of any such notice.

[36] See R. Doc. No. 41-4, ex. C at 7.

[37] The Court does, however, note without deciding that it appears Foss was ready to receive the tow at the latest at 1216 local time on September 4. See mem. opp'n 5 (arguing that the CORBIN FOSS "arrive[d] at the location in which she could receive Cashman's tow at the second anchorage at the Yuanyansha Buoy"). Demurrage would, therefore, commence accruing against Cashman twelve hours from this time, once the allotted free time had expired.

[38] See agreement 1, special instructions.

alternative, Cashman contends that neither it, nor the tow or its cargoes, was the sole cause of the delay in transit of the PCZ. In connection with this argument, Cashman further submits that the force majeure provision excludes any liability for delay "resulting from . . . public or proprietary acts of any governmental authority."[39]

With respect to Cashman's first argument, Foss counters that transit of the Panama Canal may have taken less than five days, but transit of the Panama Canal Zone took longer than five days. Foss is correct that the Panama Canal and the Panama Canal Zone need not be considered one and the same. However, the record does not disclose whether Balboa, on the Pacific Ocean side, is properly considered within the PCZ, and the Court is not in position to make such a finding.

Meanwhile, concerning Cashman's second argument, the agreement makes clear that Cashman is liable for demurrage when it (or the tow or its cargoes) is the sole cause of a delay in services. Also clear is that the failure to navigate the PCZ within five days was a delay in services. Less clear, however, is whether Cashman was the sole cause of that delay. Cashman points to entries in the daily logs of the LAUREN FOSS which suggest delays attributable to PCZ authorities and/or personnel.[40] Cashman also identifies deposition testimony of Captain Andrew R. Miller which indicates that the tow was not permitted to enter the "Rodman" area of the Panama Canal.[41]

Foss cites United States v. Atlantic Refining Co., 112 F. Supp. 76 (D.N.J. 1951), for the

---

[39] Id. § 8.

[40] See R. Doc. No. 41-5, ex. D.

[41] R. Doc. No. 41-6, ex. E, Andrew R. Miller dep. 20-21.

proposition that a charterer bears an absolute liability to pay demurrage, subject only to three narrow exceptions. Id. at 80. Foss contends that none of the exceptions apply in this case and that, therefore, Cashman cannot escape its demurrage obligations. In Atlantic Refining, though, no provision of the contract expressly limited demurrage liability to delay solely caused by the charterer. In contrast, the instant agreement does so limit the charterer's obligation.

The log entries and deposition testimony identified by Cashman are sufficient to create a genuine issue of material fact with respect to whether Cashman or another party is responsible for the delay in transit of the PCZ. Summary judgment is denied with respect to Foss's claim for PCZ demurrage.

### IV. Cashman's Lost Profits and Loss of Use Claims

In its counterclaim, Cashman alleges damages for lost profits and loss of use of its barges as a result of: 1) the delay allegedly owing to the insufficient speed and/or unseaworthiness of the CORBIN FOSS and 2) the delay from the Cristobal incident.[42] According to Cashman, the "poor performance" of the CORBIN FOSS caused five to six days of delay in the voyage. Cashman argues that it suffered $75,000 - $95,000 in damages based on loss of use during that time. Cashman further claims that the negligence of Foss during the Cristobal incident caused a delay of ten days. Cashman submits that it is entitled to $150,000 owing to the Cristobal incident. Foss seeks dismissal of any claims for lost profits or loss of use based on § 10 of the agreement, which provides as follows:

---

[42] Countercl. ¶¶ 10, 17.

11

> Except as otherwise specifically provided for herein, neither Owner, Customer, Tug, Tow, nor any other person, entity or vessel relative to this Agreement, shall be responsible for any indirect, consequential, or special damages whatsoever, including, without limitation, extra expense, loss of profits, loss of use of property, delay or damages consequential upon loss of use, whether resulting from negligence, breach hereof, or otherwise, and even if the possibility of such is or was foreseeable by Owner, Customer, or any other person or entity.

Foss asserts that this provision unequivocally precludes Cashman from recovering lost profits or use damages. Cashman responds that the limitations provision, construed together with all other provisions of the agreement, effectively exculpates Foss from all liability for its own negligence. This result, Cashman argues, is impermissible under Bisso v. Inland Waterways Corp., 349 U.S. 85 (1955).

In Bisso, the U.S. Supreme Court adopted a rule "invalidating contracts releasing towers from all liability for their negligence." Id. at 90. Foss, citing Sixth Circuit and Northern District of California precedent, argues that the Bisso rule does not invalidate § 10, however, because that provision merely limits liability rather than immunizing Foss from liability altogether. Further, section 10 only deals with indirect, consequential, or special damages; it imposes no bar to recovery of direct damages. See Canarctic Shipping Co., Ltd. v. Great Lakes Towing Co., 670 F.2d 61, 63 (6th Cir. 1982) (declining to read Bisso to invalidate a tariff provision limiting the amount of demurrage recoverable); Gaida Shipping Corp. v. TUG S/R MARE ISLAND, No. 01-4278, 2002 WL 31939082, at *6 (N.D. Cal. Sept. 9, 2002) (holding that Bisso and its progeny do not apply to provisions which merely limit, rather than exculpate, liability).

The premise of Cashman's argument that the agreement, read in its entirety, exempts Foss from all liability for its own negligence, however, is flawed. Cashman's assumption that

"there would be nothing left for Foss to accept" under § 7(C), i.e., the indemnity or "leftover liability" provision, is purely speculative. Section 7(C) plainly contemplates liability which is not covered by the insurance required by the agreement. Further, the parties appear to agree that Foss may be exposed to liability for damages caused by its negligence up to the amount of Cashman's insurance deductible. Finally, nothing in the agreement would preclude the barge owner from suing the tower directly if the tower failed to procure the required insurance.

Moreover, cross-insurance provisions such as those present in §§ 7(A)-(B) of the agreement have been upheld by the Fifth Circuit. In Twenty Grand Offshore, Inc. v. West India Carriers, Inc., 492 F.2d 679 (5th Cir. 1974), the court concluded "that the provision in the towing agreement requiring each party to fully insure its vessel to effect a waiver of subrogation, and to name the other party as an additional insured is not an exculpatory clause of the type invalidated in Bisso and Dixilyn[, 372 U.S. 697 (1963)]." Id. at 685. Contrary to Cashman's contention, the Twenty Grand court did not create an "exception" to Bisso but instead found that Bisso did not apply to such provisions. Id. at 685.

Meanwhile, Cashman does not argue that the limitation provision, standing alone, offends Bisso. Instead, Cashman argues that the insurance provisions and the limitation provision, none of which by their own terms are invalid under Bisso, are, when read together, in violation of the Bisso doctrine. The Court is not persuaded by Cashman's "two rights make a wrong" argument. Accordingly, the limitation provision is valid and plainly precludes any damages for lost revenue, profits, or use of the barges. Summary judgment is granted to Foss with respect to Cashman's claims for such damages based on the alleged negligence of Foss.

As for Cashman's claim for loss of use based on lack of speed and/or unseaworthiness,

13

the Court concludes that § 10 precludes recovery for such special damages. That claim is premised on a breach of contract theory rather than a negligence theory. However, the Court has found no authority — and Cashman cites none — that would compel a conclusion in the breach context contrary to that in the negligence context. See Coastal States Petrochemical Co. v. Montpelier Tanker Co., 321 F. Supp. 212, 220 (S.D. Tex. 1970) (concluding that Bisso "has nothing to do with a contention . . . by the plaintiff . . . of a breach of contract relating to seaworthiness where no negligence has been proven"); Alcoa S. S. Co. v. Charles Ferran & Co., 251 F. Supp. 823, 826 (E.D. La. 1966) (stating that the Bisso doctrine does not control when a party seeks to limit its liability for breach of contract, and that such limitations of liability are valid, absent inequality of bargaining power). On the basis of the valid limitation of liability contained in § 10, therefore, summary judgment is granted to Foss on Cashman's claim for lost profits, revenue, or use of its barges because of any alleged lack of speed and/or unseaworthiness.[43]

## V.     Cashman's Claim for Reimbursement of Insurance Deductible

In its counterclaim, Cashman sought reimbursement "for the first $50,000 of damages to the barges."[44] Cashman later sought to amend its counterclaim to seek reimbursement "for the first $200,000 of damages to the barges."[45] Foss seeks a summary judgment ruling that

---

[43] In light of the Court's resolution of Cashman's unseaworthiness/lack of speed claim on the basis of § 10 of the agreement, it is unnecessary to consider Foss's arguments that no genuine issue of material fact exists on the merits of that claim.

[44] Countercl. ¶ 18.

[45] R. Doc. No. 55-3, proposed pleading ¶ 1. Cashman's motion for leave to amend its counterclaim was denied by the U.S. Magistrate Judge. See R. Doc. No. 58. Cashman has appealed that order to this Court. See R. Doc. No. 60.

Cashman's reimbursement claim is capped at $50,000. The dispute between the parties is over the actual deductible in Cashman's hull and machinery insurance policy at the time of the voyage.

Foss's initial argument is that Cashman's reimbursement claim should be limited to $50,000 by Cashman's prior admissions in its pleadings and discovery responses. Cashman concedes that it mistakenly stated its deductible as $50,000 in its counterclaim.[46]

In the alternative, Foss argues that the deductible is $75,000 pursuant to a hull and machinery policy issued by American Home Assurance Company.[47] In the deductible section, the policy states: "in the event of a single occurrence involving more than one vessel scheduled above, the total deductible for that occurrence under this policy shall not exceed $75,000., all vessels combined."[48]

However, the JMC 3003 and JMC 3004 barges do not appear in the schedule of vessels contained in the hull and machinery policy issued by American Home Assurance Company.[49] It

---

A magistrate judge's nondispositive pretrial order is reviewed under a clearly erroneous standard. See Fed. R. Civ. Proc. 72(a). Finding no clear error committed by the U.S. Magistrate Judge, the Court **AFFIRMS** the order. The Court notes that it may elect to hear evidence at trial under Federal Rule of Civil Procedure 15(b) if it is satisfied that no prejudice will be caused to Foss.

[46] R. Doc. No. 49-4, mem. opp'n 17.

[47] See R. Doc. No. 35-18, ex. 4, hull and machinery policy.

[48] Hull and machinery policy 2. Meanwhile, Cashman contends that its deductible is $200,000 pursuant to a certificate of insurance attached to its opposition memorandum. See R. Doc. No. 41-9, ex. H. This document states: "Deductible increased to $100,000 any one occurrence, each barge separately insured." R. Doc. No. 41-9, ex. H. Foss states, correctly, that the certificate of insurance has not been authenticated by an affidavit. "As a general rule, '[i]n order for a document to be considered in support of or in opposition to a motion for summary judgment, it must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.'" Harvey v. Joyce, No. 99-775, 2006 WL 197013, at *7 (E.D. La. Jan. 25, 2006) (quoting Perez v. Alcoa Fujikura, Ltd., 969 F. Supp. 991, 997-98 (W.D.Tex.1997)). The Court, therefore, declines to consider this unauthenticated certificate of insurance.

[49] Hull and machinery policy 1-2.

is not clear that this policy apples to the barges in question.  Without knowing whether the policy sub judice is the controlling policy, the Court cannot determine what the actual deductible was. Therefore, there are questions of material fact that render summary judgment inappropriate on the present record.

The Court also makes the following two observations for the record.  First, Cashman seeks reimbursement of sue and labor expenses for the repair of the barges at Cristobal.[50]  Foss argues that these expenses are covered by Cashman's policy and are, therefore, subject to the whatever deductible was in place.  Cashman does not directly address Foss's contentions. Whether these expenses were (or could have been) paid by Cashman's insurer is beyond the scope of Foss's summary judgment motion; this legal question remains an open one to be fully briefed and resolved before trial.  The Court notes only that the policy appears to establish a detailed scheme for the coverage of sue and labor expenses.[51]

Second, section 7(B)(2)(a) of the agreement states that any deductible for hull and machinery insurance on the tow shall not exceed $100,000.  On the face of the agreement, the tow is described as consisting of both barges.[52]  Therefore, it would appear that any recovery by Cashman for reimbursement of its deductible would be limited to $100,000, even if its insurance policy did provide separate insurance for each barge.  The Court reserves decision of this question, however, until the parties have a fuller opportunity to brief the issue.

---

[50] Countercl. ¶ 13.

[51] Hull and machinery policy 5-7.

[52] See Agreement § 1.

## VI.     Conclusion

Accordingly, Foss's motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  Cashman's claims for lost profits and lost revenue based on alleged insufficient speed and/or unseaworthiness of the CORBIN FOSS and based on the alleged negligence of Foss during the Cristobal incident are **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** in all other respects.

Finally, the U.S. Magistrate Judge's order denying Cashman's motion for leave to file an amended counterclaim[53] is **AFFIRMED**.

New Orleans, Louisiana, October 6, 2008.

_____
LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE

---

[53] R. Doc. No. 58.